[Civil No. 4423.   Filed January 26, 1942.]

[121 Pac. (2d) 414.]

THE VALLEY NATIONAL BANK, a National Banking Association, Appellant, v. PAYNE J. WITTER, Appellee.

494

Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge and Messrs. Patterson & Eastvold, for Appellant.

Messrs. O'Sullivan & Morgan and Mr. E. C. Locklear, for Appellee.

LOCKWOOD, C. J.—Payne J. Witter, plaintiff, brought suit against Valley National Bank, a national banking association, defendant, seeking damages on account of the failure of the latter to pay certain

checks drawn by the former against it. Judgment went in favor of plaintiff in the sum of $3,000, and this appeal was taken.

There are twenty-two assignments of error, grouped under thirteen propositions of law, which raise two major questions for our consideration. First, do the facts show that plaintiff had a cause of action against defendant, and second, if so, were the elements of damages properly submitted to the jury on the evidence and the instructions.

The facts applying to the first question must be assumed to be as follows: For a long time prior to the inception of the action plaintiff had lived in Miami, Arizona, where he was employed by the Miami Copper Co. While residing there he had borrowed from the Miami branch of defendant certain sums of money. Thereafter he removed to Chandler and for about three months up to July 24, 1940, had, in partnership with a man named George Tissaw, operated a restaurant called the Rainbow Inn. Upon plaintiff's removal to Chandler the records of the Miami branch concerning his loan were transferred to the Chandler branch of defendant, and thereafter payments on the loan were made in Chandler. He had, while a resident of Miami, had a checking account with the Miami branch, but this had been exhausted by July 10, 1940, and the account closed. On July 24, plaintiff and his partner sold the Rainbow Inn to a man named Gosage, who paid them by a check drawn on the Miami branch of defendant, in the sum of $600, and a promissory note for $150. Upon receiving the check, plaintiff, together with Tissaw and Gosage, went to defendant's branch in Chandler, where he gave it to the assistant manager thereof, one Middleton, and told the latter that he wanted to pay the balance then due on his indebted-

ness, amounting to $233.82, and to put the remainder of the check in a checking account. He also told Middleton that he was going fishing for a few days. Middleton replied that he should not write a check on the account for two days so that the $600 check could clear, but that after that it would be all right. Plaintiff then signed a card handed him by Middleton either "Payne J. Witter" or "P. J. Witter," wrote a check for $183 in favor of Tissaw, in the presence of Middleton, and left the bank. It is true that Middleton's statement in regard to the details of the transaction in the bank differed widely from that of plaintiff and Tissaw, but we must assume that the jury resolved the conflict in favor of plaintiff and are bound by its action in this respect.

On the same day the $600 check was sent on in the usual manner by the Chandler branch to the Miami branch for collection, and on the morning of July 26, the Chandler branch was advised the check had cleared, so that it then had in its possession $600 that belonged to plaintiff. Thereupon plaintiff's unpaid note of $233.82 above referred to was deducted, and a cashier's check was made out in plaintiff's favor for the difference, $366.18. This check was held in the bank until the close of business on that day and was then mailed to plaintiff at the last address which it knew, 4125 Mackey Hill, in Miami. No record was ever entered in the books of the bank showing the opening of any checking account in favor of plaintiff, the whole thing being handled by it as a collection item. In the meantime, and on July 26, plaintiff visited the Miami branch of defendant and found that the proceeds of the $600 check had been sent to Chandler. He then wrote four checks on the account, which he believed from the foregoing facts he had with the Chandler bank. Two of these checks were

given Globe business houses for merchandise purchased by plaintiff, one was cashed by the Miami branch, and the last, dated July 31, was given one E. N. Reid for merchandise and cash. The total amount of these checks, including that given Tissaw and which was cashed July 26, by the Miami branch, was less than the $366.18. Plaintiff then went on his fishing trip and was gone several days, returning to Clarkdale, Arizona, on August 5, when he first discovered that none of these checks had been honored. The circumstances under which they were dishonored were as follows: A few days after the cashier's check was mailed to plaintiff's address in Miami his checks began to return to the Chandler branch and the records were examined to see whether he had a checking account. None could be found and Middleton refused to pay them, with the notation placed thereon "Refer to maker." Upon plaintiff discovering that his checks were being turned down, he called the branch in Chandler, inquring as to why this was done. He then employed an attorney to make a trip to Chandler to interview defendant in regard to the situation. On August 17 defendant issued a new cashier's check in the place of the one sent to Miami, which had not at that time reappeared, and sent it to the Bank of Arizona in Clarkdale, with instructions to deliver it upon the execution of an indemnity bond and release. Plaintiff was willing to execute the bond but was not willing to release defendant from liability for its actions, and this cashier's check was eventually returned to defendant, and later the first cashier's check was also returned to it. Thereafter this action was begun.

We think there can be no question but that on these facts plaintiff did believe, and, as a matter of law, was justified in believing, that the bank would honor

his checks up to an amount of $366.18 at any time on or after July 26. There is no question from the undisputed testimony that on July 26 the bank owed plaintiff sufficient money to pay all the checks drawn by him. The only issue is whether it had agreed to treat this amount as a checking account, or merely as the proceeds of a collection. The evidence on this point was conflicting and we are bound by the verdict of the jury to assume that it had agreed to treat the money as a checking account.

There was considerable evidence to the effect that the matter was not handled by the bank in the manner in which it usually handled the opening of an account, and this may be true, but we know of no law which requires that a bank shall open an account in any particular manner. The regulations made by the bank in regard thereto are for its own benefit and protection, and may be waived by it, either directly or impliedly by its conduct, and if such conduct was of that nature that plaintiff, as a reasonable man, would believe, and did believe, that he had done everything which the bank required in order to establish a checking account, then it is liable for a failure to honor his checks, notwithstanding the fact that some of its regulations may not have been complied with, or that it did not intend to open a checking account with him.

We hold, therefore, that a judgment for damages against defendant was justified by the evidence and the law applicable thereto.

The next question is as to the amount of damages allowed and the manner in which that issue was submitted to the jury, both by the evidence and the instructions of the court.

There is no statute in Arizona covering the liability of a bank for dishonoring a check of a

depositor, and we must, therefore, consider the principles of the common law. The relation between a bank and a depositor is held to be that of a debtor to a creditor and arises out of a contract, express or implied, that the bank will pay to the depositor, or his order, any amount not exceeding his deposit. *Brown* v. *State*, 25 Ariz. 518, 220 Pac. 225. In the ordinary case of debtor and creditor, the former is not liable to the latter in an action in tort for a failure or refusal to pay the debt, since the liability arises out of contract and is limited to the amount of the debt. However, while the relation between the bank and the depositor is that of debtor and creditor, in our modern world the effect upon the depositor of the refusal of the bank to pay upon his order goes far beyond the effect of such a failure to pay by an ordinary debtor. In the last case there is no presumed imputation against the character of the creditor which will affect his business relations in other respects, no matter how many people may know of the fact. But the refusal of a bank to pay a check of its depositor is generally considered by those who know of the failure to be an imputation of wrongdoing against the depositor and an attack upon his character. For this reason it is held practically universally that in such cases the depositor may sue either in contract, where the recovery would be limited to the amount of the dishonored check with interest from the date of demand and refusal, or in tort, where the action is held to be akin to one for slander.

In the present case the complaint obviously sets up an action in tort and is based, not upon the amount of the check, but upon the damage to the credit and reputation of plaintiff. The question then arises as to what damages are allowable in such a case and how they must be proved. The leading cases in Eng-

land are *Marzetti* v. *Williams*, 109 Eng. Reprint 842, and *Rolin* v. *Steward*, 139 Eng. Reprint 245. In these cases, as in most of the earlier American cases, a distinction was made between cases where the depositor was a merchant or trader and where he was not. In the first case it was very generally held that the mere proof of the dishonoring of the check entitled the plaintiff to "not nominal or excessive, but reasonable and temperate damages." *Rolin* v. *Steward, supra.* In the second, although nominal damages should be awarded without further evidence, substantial damages could only be awarded on allegation and proof of special damages.

Upon a general examination of the cases which distinguish between the trader and the non-trader, and their reasoning, it is apparent that the rule was based upon the theory, true enough when the rule was first laid down, that the injury was to the ability of the depositor to obtain further financial credit in his dealings with others; that practically all of the business of a merchant or trader was based upon credit rather than cash transactions, and that any attack upon his financial character was necessarily bound to diminish his ability to obtain further credit and thus injure his business. On the other hand, the non-trader seldom had a bank account, conducted most of his dealings for cash, and only required credit in isolated and special instances, so that there was no reason to presume that a failure to pay one of his checks, in the rare instances where he did possess a bank account, would affect a credit which presumably was not used or did not exist. The situation, however, has greatly changed in recent years. The vast majority of all modern financial transactions, whether carried on by traders or non-traders, are based upon credit. A large percentage of our

population conduct even their household accounts on a monthly credit basis, usually paying by checks on their own bank accounts, and the dishonoring of one of those checks would presumably affect their credit, even though it was not as great in dollars and cents, just as seriously in proportion to the extent of their transactions with those who knew of the dishonor, as would the dishonoring of the check of a great merchant. In both cases, under modern business conditions, we think the presumption from the mere fact of dishonor is that the credit of the depositor was injuriously affected. As was said in Morse on Banks and Banking, 6th Ed., page 1007, par. 458:

" . . . It can hardly be possible that a customer's check can be wrongfully refused payment without some impeachment of his credit, which must in fact be an actual injury, though he cannot from the nature of the case furnish independent distinct proof thereof. It is as in cases of libel and slander, which description of suit, indeed, it closely resembles, inasmuch as it is a practical slur upon the plaintiff's credit and repute in the business world. Special damage may be shown, if the plaintiff be able; but, if he be not able, the jury may nevertheless give such temporary damages as they conceive to be a reasonable compensation for that indefinite mischief which such an act must be assumed to have inflicted, according to the ordinary course of human events. . . . "

■ While an application of the principle above set forth has been limited by the numerical majority of cases to traders, we think in reason and logic the principle applies to non-traders, although of course what would be "reasonable and temperate" damages would vary according to the circumstances of the case and the general extent to which it may be presumed the credit of the depositor would be injured.

■ We hold, therefore, that in the present case, plaintiff was entitled to "reasonable and temperate"

rather than "nominal" damages upon the proof of the wrongful dishonoring of his checks, without the necessity of showing affirmatively specific damages. In addition to these general damages, he, like any other depositor in similar circumstances, might recover, upon proper proof thereof, any peculiar and special damages which he may have suffered by reason of the conduct of the bank.

With these general principles to guide us, let us examine the instructions of the court to see if they presented the legal aspect of the case properly to the jury, and the evidence to see whether it was properly admitted and rejected.

We have examined the instructions given by the court. It is sufficient to say that the statements made therein of the law applicable to the case are correct and were sufficient to advise the jury of the general issues.

We have also examined carefully each of the instructions requested by defendant but refused, and presented to us under assignments of error thirteen to nineteen, inclusive. We think it unnecessary to go into each one in detail as it could be of no value for a precedent in other cases. Some of them would be correct if applied to a situation not appearing from the record in the present case. Most, however, are erroneous in that they do not correctly state the law, or state it only partially, so that the giving of the particular instruction would tend to mislead the jury. There was no error in refusing to give these instructions.

We consider next the admission of evidence. Plaintiff presented testimony tending to show that he had been unable to complete negotiations for the lease of certain property on account of the dishonoring of one of his checks. In his complaint he

predicated special damages on the loss of profit from this lease. The court declined to admit any evidence as to the amount of profit which he might have made, but did admit the evidence that he had lost the lease on the question of loss of general credit and reputation. We think the ruling was correct in both respects. As we have stated, plaintiff was entitled to substantial damages. These damages, even though general in their nature, might vary considerably in accordance to the extent which they injured plaintiff's general credit. We think, therefore, that any instance in which plaintiff was denied credit or lost the opportunity to engage in a business transaction by reason of the dishonoring of the checks was admissible on the issue of general damages, even though the details of the transaction might not be admissible as tending to show special damages. There was also evidence in regard to the failure of plaintiff to secure employment by reason of the situation. We have examined the testimony in this respect and think the rulings of the trial court were proper, for the same reason that evidence in regard to the loss of other business opportunities was admissible. The same is true in regard to the loss of credit with certain mercantile institutions. As was said by the court, where general damages to financial reputation and credit are concerned, it is almost impossible to furnish specific evidence of their extent and this can only be based upon evidence of the general effect upon plaintiff's financial standing in the community. There are perhaps one or two instances where the court may have allowed plaintiff to go a little more into detail than was, strictly speaking, permissible, but we think these instances were not such as could have affected the verdict of the jury.

504

■■■■■■ We next consider certain general objections. The first is that the court erred in granting plaintiff a jury trial because he had not demanded it in the manner set forth by section 21–908, Arizona Code 1939. It is sufficient answer to this objection to say that under section 21–912, Arizona Code 1939, the court, in its discretion, may order a trial by jury even though such demand has not been made, and we must presume that the court had good reason therefor. The second is that the court permitted plaintiff to make a trial amendment, setting up as special damages the sums expended by him as attorney's charges and telephone in endeavoring to secure a settlement of the matter. We certainly think these expenses were a proper element of special damages and cannot see where defendant was prejudiced in its defense by allowing the trial amendment. The expenditures either were or were not necessary, and this issue could have been met by defendant without the necessity of a continuance.

■■■■ The next objection is that the trial court allowed the jury to take into the jury room a copy of the written instructions. If the instructions were correct, and we have held that they were, we think it was not only permissible but commendable for the court to do so. The purpose of instructions is to advise the jury as to the law, and at all times in considering its verdict a jury should keep them in mind. We can think of no better method of enabling it to do this than to have the written instructions of the court always before it.

■■■■ Misconduct on the part of plaintiff's counsel in arguing to the jury that plaintiff was a poor man is set up as a ground for reversal. The court carefully instructed the jury to disregard the statement, and that whether he was or was not had

nothing to do with the case, and counsel was admonished to make no further reference to matters of that kind. We think the remark was improper, but was not so prejudicial that it should cause a reversal of the case. The evidence properly admitted had already advised the jury that plaintiff was a man of limited means.

The last objection is that the damages were excessive and the result of passion and prejudice. Where the refusal to pay was not malicious damages in a case of this nature are limited to the monetary loss reasonably and fairly and in the natural course of things resulting from the act of the bank, and no damages can be allowed for mental pain or suffering, such as humiliation and the embarrassment of the depositor in his social relations. It appears from the evidence that plaintiff's ordinary occupation was that of a mechanic, although he at least once engaged in independent business on a small scale and was considering doing so a second time. While it is true, of course, that the social pain, humiliation and disgrace suffered by a man under these circumstances is as great as that endured by a man of large business affairs, yet since such elements cannot be considered on the issue of damages, it would appear that his financial loss as shown by the evidence, even liberally construed, could not reasonably be considered to reach the amount of the verdict returned by the jury.

We are of the opinion on the whole record, under the circumstances of the present case, that the sum of $1,500 is damages both substantial and reasonable, and the judgment is modified by reducing it to that amount and, as reduced, is affirmed. Defendant will recover its costs in this court.

McALISTER and ROSS, JJ., concur.