565 P.2d 1294

**Eloise EMBRY, Individually and as surviving spouse of Dale H. Embry, Deceased for the benefit of herself and surviving children, Appellant,**

v.

**GENERAL MOTORS CORPORATION, a Foreign Corporation, and Murray-Bryant Chevrolet Company, an Arizona Corporation, Appellees.**

No. 2 CA–CIV 2138.

Court of Appeals of Arizona, Division 2.

March 15, 1977.

Rehearing Denied May 17, 1977.

Review Denied June 7, 1977.

Rees, Mercaldo & Smith, P.C. by Paul G. Rees, Jr., Tucson, for appellant.

Lesher, Kimble, Rucker & Lindamood, P.C. by William Kimble, Tucson, for appellees. .

## OPINION

HOWARD, Chief Judge.

This is a wrongful death case which resulted in a jury verdict in favor of appellees, defendants below. Briefly, the facts show that the decedent was killed when the automobile which he was driving on Interstate Highway 10 towards Phoenix grazed the guardrail on the right side of the highway, veered to the left, crossed the paved portion of the highway and struck a concrete pillar headon. It was estimated that he was going between 70 to 85 mph when he hit the concrete pillar.

It was appellant's theory that the accident was caused by a design defect in the 1969 Chevrolet Caprice automobile which was being driven by the decedent. Testifying as an expert witness for appellant was a Mr. Edward J. Horkey. He examined the remains of the decedent's automobile and found that the engine was no longer attached to the frame. About a month after the accident, he also examined the carburetor from the automobile in a junkyard where the automobile had been taken. He found the butterfly valve in the carburetor partially open. He also spoke with Mrs. Embry who informed him that prior to the accident she had noticed that when the automobile started forward from a stationary position there would be some hesitation when one initially stepped on the gas pedal but then the automobile would "shoot forward" followed by a thumping sound. From this information Mr. Horkey concluded that the engine mounts were broken prior to the accident and that when the decedent pulled to the left after hitting the guardrail, the engine lifted, jamming the accelerator linkage and caused the throttle to become wide open. This caused the decedent to lose control after he hit the guardrail and thus was the proximate cause for his running into the concrete pillar.

Witnesses testifying for General Motors were James Tomlinson, a General Motors engineer from Detroit and Marshall Day, an accident reconstruction expert from Tucson, Arizona. General Motors ran several tests with its motor mounts to determine the characteristics of a motor mount when it was broken due to impact as opposed to metal fatigue. Its tests showed that the broken motor mounts would display certain distinctive characteristics when the break was due to impact as opposed to a break due to metal fatigue. These test results were presented to the jury in the form of the motor mounts themselves, photographs and testimony of Mr. Tomlinson and Mr. Day. These witnesses concluded that the engine mounts were broken upon impact against the pillar and were not broken before the accident. Mr. Tomlinson, after listening to the testimony of Mrs. Embry, testified that in his opinion the driving characteristics of the Chevrolet which she had described to Mr. Horkey and which she described to the jury, were not attributable to broken motor mounts.

Both expert witnesses for General Motors ran experiments on a 1969 Chevrolet Caprice with broken motor mounts to determine under what driving circumstances the engine would rise from the frame. Their results, documented by motion pictures and still photographs, showed that the engine would rise only when the car was rapidly accelerated from a dead stop or very low speed at which time the engine would rise, hit the accelerator linkage and then after speed was gained would settle back on to the frame. These witnesses explained that the reason the engine would rise up off the frame from a stop position was the torque which was created when the car was rapidly accelerated from this position. The torque which was created would be greater than the weight of the engine and thus, if the last engine mount were broken, the torque would be sufficient to raise the engine up. As speed increased the torque decreased and the engine would then settle back into position. They also testified and demonstrated by means of movies that at a higher speed there is less torque and that at these higher speeds there is no way in which there is sufficient torque to raise the engine off the frame.

Based upon their experiments and inspection of the engine mounts, these experts

stated that in their opinion the accident did not occur because of any design defect in the automobile and that the engine mounts were broken when the automobile impacted headon into the concrete pillar. Mr. Tomlinson also testified that he attributed no significance to the fact that the butterfly valve of the carburetor was partially open. He gave two reasons for his conclusion: (1) the carburetor was not seen until one month later in the junkyard and there was therefore no way to tell what its condition had been just after impact and (2) the impact itself would cause the butterfly valve to be partially open.

At the pretrial conference an allegation of negligence was dropped and the case was tried on the theory of strict liability and breach of express or implied warranty.

Appellant presents the following questions for review which we have taken the liberty to paraphrase for the sake of clarity. (1) Did General Motors have an obligation to warn of its design defect? (2) Was James Tomlinson an adverse witness subject to cross-examination pursuant to Rule 43(g), Arizona Rules of Civil Procedure? (3) Did the court err in rejecting evidence which would have demonstrated that General Motors knew that under certain driving modes and conditions the engine on the 1969 Chevrolet Caprice would rise off the frame and bind the accelerator linkage and evidence of steps which could be taken to secure the engine? (4) Did the court err in instructing the jury that the defective condition must be unreasonably dangerous to the user?

## FAILURE TO WARN

■ Appellant offered the following instruction which was rejected by the trial court:

"A party who manufactures a product which he has reason to foresee may cause injury from a particular use is required to give an adequate warning of the danger. If he fails to do so he is liable for any injury resulting from the failure to warn."

To answer appellant's first contention we start off with the proposition that a manufacturer's· strict liability in tort may be based upon a defect in design of the product as well as on a defect in manufacture. *Mather v. Caterpillar Tractor Corporation*, 23 Ariz.App. 409, 533 P.2d 717 (1975); *Pike v. Frank G. Hough Company*, 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229 (1970); 2 American Law of Products Liability 2d, § 9:16. Appellant did not contend that the automobile was faultlessly constructed and designed. On the contrary, her theory and contention was that there was a design defect because if the motor mounts broke, under a certain mode of driving, the engine could bind the accelerator linkage. Only with this design defect could one consider the automobile to be unreasonably dangerous. If there were no design defect, the failure to warn added nothing to appellant's claim.

■ Under Restatement of Torts (Second), § 402A, products though faultlessly made, may nevertheless be deemed "defective" if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning. *Gherna v. Ford Motor Company*, 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966). The failure to warn comes into play in a strict liability case when the product is perfectly manufactured and meets every requirement for its designed utility but nevertheless is unreasonably dangerous because of a failure to warn of its dangerous characteristics. *Jackson v. Coast Paint and Lacquer Company*, 499 F.2d 809 (9th Cir. 1974); *Tucson Industries, Incorporated v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972). Here, however, we are not dealing with a product claimed to have been faultlessly manufactured and designed. Under such circumstances the court did not err in failing to give the foregoing instruction.

## CROSS–EXAMINATION OF WITNESS

■ Mr. Tomlinson was called by appellant in her case in chief. He testified that he was an engineer for General Motors and spent most of his time aiding lawyers for General Motors in preparing the defense of

product liability cases and testifying in these cases. Appellant requested that the court allow him to be examined pursuant to Rule 43(g), Rules of Civil Procedure, as an adverse party or managing agent. The trial court's refusal to allow such examination is cited as error. We do not agree. Mr. Tomlinson was neither an adverse party nor a managing agent. He was an employee in a section of General Motors along with five other persons. He was not even the head of the section. He was not ". . . a person invested with *general powers* to exercise his judgment and discretion in dealing with corporate matters." (Emphasis added) *Bogard GMC Company v. Henley*, 2 Ariz.App. 223, 226, 407 P.2d 412, 413 (1965). His powers were limited to the specific tasks which were assigned to him.

## REJECTION OF EVIDENCE

■ Appellant contends the trial court erred in rejecting evidence which would show that General Motors knew that certain models of a Chevrolet automobile, including the one owned by decedent, contained a defect. In particular, error is claimed in rejection of the following: (1) A memo sent to the General Motors Automotive Safety Engineering Department by its engineering staff which indicated that under certain driving conditions the 1969 Chevrolet engine would rise if the motor mounts were broken and jam the throttle in a full open position, further stated there was a question as to the ability of the motor mounts to hold if the rubber between the metal section sheared and suggested the installation of an interlock system to hold the engine if the motor mounts broke; (2) a Chevrolet dealer product campaign bulletin sent by General Motors to its dealers which indicated that under certain driving modes torque will cause the engine to rise and affect the throttle linkage momentarily increasing the throttle opening, possibly to full throttle; and (3) recall letters sent to the decedent after the accident which noted the defects previously set forth.

Appellant suggests that the foregoing were admissible as "admissions". Assuming arguendo that the evidence was admissible on such theory, there was no error in rejecting it since the tests run by Tomlinson and Day, the results of which were explained to the jury, demonstrated to the jury that indeed, under certain driving conditions, the engine would rise and cause the throttle linkage to bind.

As far as General Motors' knowledge of the defect is concerned, appellant again argues the failure to warn as a basis of liability, a theory which we have already rejected.

Since the failure to warn was not an issue in this case, appellant's contention that the trial court erred in not allowing evidence of the feasibility of redesigning the motor mount in order to prevent the engine from lifting for the purpose of showing General Motors' knowledge of the defect is without merit. Furthermore, the trial court did in fact allow Mr. Tomlinson to testify that the motor mounts could be designed so that if the mounts failed there would be some other restraining device which would prevent the engine from rising.

■ Appellant has cited to us the case of *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okl.1976). In that case the Supreme Court of Oklahoma held, in a' strict liability case, that "if a defect contributing to or causing the accident is a defect that is the subject of the recall letter, then the letter would be some evidence that the 'defect existed at the time the product left the manufacturer.'" 555 P.2d at 58. The defect alleged to have existed in the Oklahoma case was a manufacturing defect and not a design defect. Since the theory in the case at bench was that there was a design defect, there was no issue as to whether the defect existed at the time the product left the manufacturer.

## THE "ERRONEOUS" INSTRUCTION

■ Appellant contends that the trial court erred in instructing the jury that the defect must be "unreasonably dangerous". This question was answered adversely to appellant's position in the case of *Byrns v.*

*Riddell, Incorporated,* 113 Ariz. 264, 550 P.2d 1065 (1976).

Affirmed.

HATHAWAY and RICHMOND, JJ., concur.