**MONTGOMERY WARD & COMPANY and Firestone Tire & Rubber Company, Appellants (Defendants Below),**

v.

**Robert GREGG, Appellee (Plaintiff Below).**

**No. 41A01–8903–CV–63.**

Court of Appeals of Indiana, First District.

May 31, 1990.

Rehearing Denied Aug. 17, 1990.

Joe N. Van Valer, Van Valer & Williams, Greenwood, Richard D. Wagner and James G. McIntire, Krieg Devault Alexander & Capehart, Indianapolis, for appellants.

Peter L. Obremskey, Parr, Richey, Obremskey & Morton, Lebanon, and Tom G. Jones, Jones, Loveall & Johnson, Franklin, for appellee.

ROBERTSON, Judge.

This case comes to us following a jury verdict in the sum of one million dollars plus costs for the plaintiff Robert Gregg who sustained injury on July 24, 1979 when the tire he was changing exploded. Defendant-appellants Firestone Tire & Rubber Co. and Montgomery Ward & Co. (collec-

tively referred to as Wards), manufactured and sold the 16″ diameter truck tire which is the subject of this litigation. We affirm.

Gregg proceeded against Wards solely upon the legal theory of strict product liability alleging that the design of the tire rendered it unreasonably dangerous when mismatched with and inflated upon a 16.5″ rim. Gregg also alleged the tire was unreasonably dangerous because Wards failed to adequately warn that the tire could be mounted safely only on a 16″ rim.

The defendants jointly appeal the verdict and judgment on multiple grounds but the errors alleged fall principly into three categories: error in the denial of Wards' motion for judgment on the evidence; error in the admission and exclusion of evidence; and, error in the giving and refusing of instructions.

### I.

*Motion for Judgment on the Evidence*

■ In determining whether the trial court erred in denying Wards' motion for judgment on the evidence, we examine the evidence and all reasonable inferences most favorable to Gregg from a qualitative as well as quantitative perspective. A judgment on the evidence is proper only when there is a total absence of evidence in favor of the plaintiff upon the issues, the evidence is without conflict and susceptible of but one inference and that inference is in favor of the defendant, or the inference intended cannot logically be drawn from the proffered evidence, either because the inference cannot be drawn without undue speculation or because the witness is lacking in credibility. *American Optical Co. v. Weidenhamer* (1983), Ind., 457 N.E.2d 181, 183–184.

### A. Open and Obvious Rule

■ The Indiana Supreme Court's recent decision in *Koske v. Townsend Engineering Co.* (1990), Ind., 551 N.E.2d 437 eliminates the need for discussion of Wards' first two arguments, that Gregg is barred from recovery by reason of the open and obvious rule as set forth in *Bemis Co., Inc.*

*v. Rubush* (1981), Ind., 427 N.E.2d 1058, *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 and its progeny, and that Wards had no duty to warn Gregg of the dangers arising as a consequence of mismatching as a matter of law,[1] as well as Gregg's argument on tendered instructions 10 and 11. Gregg's theory of strict liability, premised upon an incident occurring on July 24, 1979, is governed by the 1978 Product Liability Act. That legislation, which preempted the field of product strict liability in tort, excluded the open and obvious rule from its codification and restatement of the common law. *Koske,* 551 N.E.2d at 442. Hence, the open and obvious danger rule no longer applies to strict liability claims under the Indiana Product Liability Act. *Id.* The obviousness of the danger is still however an appropriate consideration in assessing a manufacturer's expectations regarding product use and in evaluating the actual state of mind of the product user when the affirmative defense of incurred risk is raised. *Id.* at 441.

### B. Incurred Risk

■ Wards contends that its motion for judgment on the evidence should have been granted because certain undisputed facts establish Gregg incurred the risk of injury as a matter of law. Wards relies upon both the statutory defense, IND. CODE 33–1–1.5–4(b)(1) and Indiana's common law doctrine of incurred risk.

Again, the 1978 Product Liability Act expressly delineated the allowable affirmative defenses to a complaint sounding in strict liability. I.C. 33–1–1.5–4(b)(1), which incorporates a subjective standard and provides

(b) [w]ith respect to any product liability action based on strict liability in tort:
(1) [i]t is a defense that the user or consumer discovered the defect and was aware of the danger and nevertheless

proceeded unreasonably to make use of the product and was injured by it ...,

codified the common law doctrine of incurred risk. *See, Koske,* 551 N.E.2d at 442, n. 3; *Corbin v. Coleco Indus., Inc.* (7th Cir.1984), 748 F.2d 411 and *cf., Moore v. Fed. Pacific Elec. Co.* (1980), Ind.App., 402 N.E.2d 1291, 1293.

The jury found Wards' tire was unreasonably dangerous either because, in the absence of an appropriate warning, it could easily be mismatched with a 16.5″ rim, or because, if so mismatched, its bead bundle would break when subjected to less than normal operating pressure. That Gregg knew the tire was not sealing properly on the rim, knew how to use an air gauge, knew the normal operating pressure for a passenger tire and knew the pounds per square inch (psi) ordinarily necessary to seat a passenger tire does not establish as a matter of law that Gregg had actual knowledge and appreciated the danger of explosion at less than the normal operating pressure associated with mounting a 16″ truck tire on a 16.5″ rim. It is clear from the record that a 16.5″ tire could not be discerned from a 16″ tire when the tires are standing side by side. Neither Gregg nor Barnes discovered the mismatch and neither had reason to suspect the tire's failure to seal was due to a mismatched rim as both had shared the experience, common among tire mechanics, that tires with properly matched rims would refuse to seal for a variety of reasons.

### C. Misuse

■ Wards argues that Gregg and Barnes', a garage employee, misuse of the tire by placing it on the wrong size rim is a complete defense to any strict liability it may have because it did not manufacture or design its 16″ tire for use on a 16.5″ rim and misuse of the tire in this manner could

1. The rule as articulated in *Bemis, Koske,* 551 N.E.2d at 440, is as follows:
 [i]n the area of products liability, based upon negligence or based upon strict liability under § 402A of the Restatement (Second) of Torts, to impress liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product. Although the manufacturer who has actual or constructive knowledge of an unobservable defect or danger is subject to liability for failure to warn of the danger, he has no duty to warn if the danger is open and obvious to all.

not be reasonably foreseen.[2] The evidence favorable to the jury's verdict established however that, to the extent it can be said Gregg and Barnes' unintentional use of the 16″ tire was a misuse, such a use was reasonably foreseeable by Wards.

Industry documents evince 14″/14.5″ nonvehicular tire mismatch explosions as early as 1971. Indeed, Firestone knew of bead breakage problems in its 16″ tire, caused by forcing the smaller 5 degree bead onto a 16.5″ rim with a 15 degree angle, in 1955, when it applied for a patent on the tire. Firestone manufactured the private brand Wards tire which injured Gregg in the last month of 1974. By that time it had already begun molding a warning on *its* 16″ tire and attaching stickers to the tread advising users to mount the tire only on a 16″ rim.

D. Status as a User or Consumer

■ Wards offers a three-pronged standing argument. First, it compares this case to *Wingett v. Teledyne Indus., Inc.* (1985), Ind., 479 N.E.2d 51 and argues that Gregg's "use" of the tire was not reasonably foreseeable and therefore, Gregg was not within the class of persons whom Wards might anticipate to be subject to harm.

Both Gregg and Wingett were working on the product when it caused injury but that is where the analogy stops. Gregg was not destroying the tire or removing it from use. Indeed, he was not undertaking a risk foreign to proper and continued use of the tire at all. Surely, given the durability of tires generally and the nature of their use, Wards could reasonably expect its tire would be "changed" multiple times.

Wards next contends that Gregg was not an "expected user" within the meaning of the 1983 Act because he was not properly trained. Assuming the 1983 Act applies and the concept of expected user is somehow different from "user or consumer,"

the evidence offered by Gregg established that tire mechanics typically are not trained. There are no professional standards and no standardized training procedures. Tire changing is a menial job, performed routinely by persons without knowledge of the differences in tire sizes. It is a skill passed from one mechanic to the next. Wards' assertion therefore that its expected user is an individual properly trained in the service of tires is not borne out by the record.

Finally, Wards contends that Gregg, an officious intermeddler, was not a user or consumer within the meaning of the 1978 Act. Included within the definition of "user or consumer" is "any individual who uses or consumes the product." I.C. 33–1–1.5–2.

Prior to the 1978 codification of product liability common law, Indiana courts adopted § 402A of the Restatement (Second) of Torts (1965) (hereafter 402A). See e.g., *Cornette v. Searjeant Metal Prod., Inc.* (1970), 147 Ind.App. 46, 258 N.E.2d 652. Since the 1978 Act does not explicitly or implicitly purport to constrict the class of persons entitled to maintain a strict product liability action at common law, *State Farm Fire & Casualty Co. v. Structo Div., King Seeley Thermos Co.* (1989), Ind., 540 N.E.2d 597, 598, "user" includes those who are passively enjoying the benefit of the product as well as those who are utilizing it for the purpose of doing work on it, as in the case of an employee of the ultimate buyer who is making repairs.[3] Restatement, *id.*, comment 1. *Cf. also*, *Phelps v. Sherwood Medical Indus.* (7th Cir., 1987), 836 F.2d 296; *Ruther v. Robins Engineering & Constructors* (7th Cir., 1986), 802 F.2d 276.

The gratuitous nature of Gregg's actions does not provide a principled basis for distinguishing Gregg from other users. Gregg was mounting the tire on a rim

---

**2.** In Indiana, misuse is a defense only if it is nonforeseeable. I.C. 33–1–1.5–4(b)(2).

**3.** Contrary to Wards' assertions, this court's holding in *Thiele v. Faygo Beverage, Inc.* (1986), Ind.App., 489 N.E.2d 562, *trans. denied,* that a sale to a first consuming entity must occur

before the protection of the Act is triggered does not translate into a requirement that the plaintiff prove an actual sale. § 402A requires only that the product be injected into the stream of commerce. *Link v. Sun Oil Co.* (1974), 160 Ind.App. 310, 312 N.E.2d 126, 130, *trans. denied.*

when the tire exploded. The possibility of injury to an individual mounting the tire existed whether or not the individual was at that time a paid employee.

### E. Defective Condition Unreasonably Dangerous to User

█ Inasmuch as millions of 16″ tires have been changed without injury, Wards maintains that the evidence conclusively establishes that the tire was not unreasonably dangerous. Again, on appellate review, the question we consider from a perspective favorable to the verdict is whether Gregg has presented sufficient evidence to permit a logical inference that the tire was dangerous to an extent beyond that contemplated by the ordinary user having knowledge typical of that possessed by the community of users generally.

Gregg's evidence showed that as a general proposition tire mechanics are not trained. They learn what they know about mounting tires from others. Tire changing is a task of low priority, comparable in stature with sweeping the garage floor.

Typically, mechanics determine the size of a tire by comparing and feeling it. In the ordinary experience of a tire mechanic, if a tire will fit on the rim, it belongs with the rim and can be inflated without danger. An average mechanic does not know of the existence of a 16.5″ tire or rim.

A tire mechanic unaware of the existence of a 16.5″ tire would in all likelihood not be able to discern by looking at a 16″ tire that it was the wrong size for a 16.5″ rim. 16″ and 16.5″ tires look a great deal alike; they differ only slightly in the diameter, circumference, and angle of the bead. The 16″ tire fits rather easily on a 16.5″ rim and when inflated it will hold air. As a practical matter, no other motor vehicle tire mismatched in this manner will still appear to be capable of sealing.

The markings on the Wards tire do not make the difference self-evident either, even though the size is contained in a serial number on the tire. For example, the tire does not indicate whether it needs a tube. If it did, the tire mechanic would realize that the tire and rim were mismatched because both tube and rim would have valve stems. Many tires have imprinted on them the maximum inflation pressure. This tire did not.

Finally, a tire mechanic would not be able to identify a mismatch situation from the tire's refusal to seal. The beads of bias tires typically refuse to seat without some manipulation by the mechanic. Routinely, as happened in this case, the tire mechanic must deflate the tire after an initial attempt, relubricate it, and inflate the tire again to get the tire to seal. Although tire manufacturers recommend that not more than 40 psi ever be used to get a tire to seal, the common practice among mechanics is to inflate the tire to as much as 10 psi over the designated operating pressure to get the bead to seat and then deflate the tire to the designated operating pressure after the tire seals. This procedure is specifically advised by certain automobile manufacturers in their operating manuals.

The evidence recited above objectively substantiates Gregg's theory that without a warning, the Wards tire was unreasonably dangerous to the ordinary user.

The appropriateness of the trial court's decision to permit the jury to evaluate Gregg's bead bundle design defect theory is not quite as obvious. The evidence relevant to this theory came primarily from expert Milner. Milner testified that the bead grommet which runs around the circumference of the tire contains steel wire which is not capable of extending appreciably. When inflated, air pressure with a force of about two tons causes the grommet to hold tightly onto the rim's surface. When a 16″ tire is mounted upon a 16.5″ rim, the bead is 1.6″ too short. The grommet cannot be forced symmetrically up against the flange of the rim and often will chord; that is, the steel wires which formerly were wound parallel with each other will separate and take a short cut across the circumference. When this happens, the wires are no longer working in concert to share the load. As a consequence, the grommet becomes extremely stressed and the bead's structural capabilities are radically altered.

Milner opined that the bead used in the Wards tire is inherently defective and unreasonably dangerous because its design enhances the weakness of a grommet already weakened by chording. The wires contained in a Wards bead are wound in such a manner as to have a distinctive beginning and end. It is a basic engineering principle that where there is a sharp change in the geometry of a particular structure, such as the beginning of the wire, stress will concentrate. If the end of the wire happens at a critical point in the location of the chord, the stress on the wire concentrates at that point, adding another negative factor to the strength of the wire. Hence, the bead will break because of its design at much less pressure that it would ordinarily be expected to withstand. Where as here the user is dealing with a relatively high pressure tire, a bead break is likely to lead to a very violent explosion.

Bead breakage in this manner occurs only in instances of mismatch. The design does not lead to injury when the tire is properly mounted on a 16″ rim. Given however that mismatches were foreseeable by Wards, Gregg's theory is simply that Wards' bead design does not provide the kind of reasonable protection afforded by other feasible designs.

Wards cites *Latimer v. Gen. Motors Corp.* (7th Cir., 1976), 535 F.2d 1020, for the proposition that a manufacturer is under no obligation to anticipate a misuse and account for that contingency in its design. However, even if *Latimer* stated the rule in Indiana on this point, the Indiana Supreme Court's decision in *Miller v. Todd* (1990), Ind., 551 N.E.2d 1139, adopting the crashworthiness doctrine, has modified that rule.

*Miller v. Todd* holds that the expected use of a motor vehicle includes the likelihood of a collision; hence, a motor vehicle manufacturer may be strictly liable for injuries sustained in a motor vehicle accident when a design defect, though not the cause of the accident, causes or enhances injuries. Accordingly, "defectiveness" means more than that the product failed and caused injury; it means that the product failed to provide the consumer with reasonable protection under the circumstances surrounding a particular accident. *Miller v. Todd* permits a claimant to prove a defect by demonstrating that under the circumstances, a feasible, more practicable product design would have afforded better protection. Although *Miller v. Todd* is not directly applicable here, it follows that other forms of predictable danger associated with use, though not the direct cause of an accident, are nevertheless incorporated in the concept of expected use.

As we have already detailed in other sections, Gregg's evidence established industry-wide knowledge of the latent danger associated with mismatch and Firestone's recognition of the inherent weakness of its bead design. Expert Milner testified that a cable-type bead with wrapping around the wires similar to that employed by Michelin would minimize or eliminate the bead failure which occurs because of a mismatch. Dr. Milner knew of only two failures of the cable-type bead in ten years, neither attributable to the stress concentration phenomenon at work here.

Thus, contrary to Wards' · assertions, there is some qualitatively adequate evidence in the record from which the jury could conclude that the use of an alternative bead design would have precluded Gregg's injuries. Since both the possibility of mismatch and bead breakage were reasonably foreseeable, we conclude the trial court correctly permitted Gregg's design defect theory to go to the jury.

■ Even if Gregg's evidence of defect in design was insufficient to establish that the tire was in a defective condition unreasonably dangerous to the user, error in denying the motion for judgment on the evidence would be harmless as the design defect theory was not the exclusive basis for liability. There was sufficient evidence on the warning theory to make it a viable, alternative basis for recovery. *Picadilly, Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217, 1220. *See also Gariup Constr. Co., Inc. v. Foster* (1988), Ind., 519 N.E.2d 1224; *In Re Estate of Fanning* (1975), 263 Ind. 414, 417, 333 N.E.2d 80; *Nehi Beverage Co. v.*

*Sims* (1987), Ind.App., 509 N.E.2d 1125, 1128, *trans. denied. But cf., State v. Hall* (1982), Ind., 432 N.E.2d 679, 681.[4]

### F. State of The Art Defense

 Wards urges application of its state of the art defense to both the design defect and warning theories of liability, arguing in essence that its tire was designed and labeled in conformity with the prevalent industry standards and customs at the time of manufacture. Wards has not argued a common law basis for its state of the art defense; hence, we will not explore further the defense as it relates to Gregg's warning theory. I.C. 33–1–1.5–4(b)(4), by its terms, applies only when "the physical harm is caused by the plan or design of the product."

Although the legislature has made it "a defense that the methods, standards, or techniques of designing and manufacturing the product were prepared and applied in conformity with the generally recognized state of the art at the time the product was designed or manufactured," I.C. 33–1–1.5–4(b)(4), the Act does not supply us with a definition of the term "state of the art." Ordinarily, when a particular construction has not been expressly provided, the legislature intends that words and phrases be given their plain and ordinary meaning. However, technical words and phrases having a peculiar and appropriate meaning in law are given technical import. I.C. 1–1–4–1(1).

Neither Black's Law Dictionary (5th ed. 1980) nor Ballentine's Law Dictionary (3d ed. 1969) proposes a definition. A general survey of the term's usage in other jurisdictions suggests varied treatment, from the interpretation espoused by Wards of custom in the industry to definitions incorporating notions of technical capability and feasibility of design. *Cf. Sturm, Ruger & Co., Inc. v. Day* (1979), Alaska, 594 P.2d 38, *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209, *overruled on other grounds,* 703 P.2d 396, 405; *Smith v. Minster Machine Co.* (10th Cir., 1982), 669 F.2d 628 with *Cantu v. John Deere Co.* (1979), 24 Wash.App. 701, 603 P.2d 839; *Wiska v. St. Stanislaus Social Club, Inc.* (1978), 7 Mass.App.Ct. 813, 390 N.E.2d 1133, 1138, n. 8; and, *Gosewisch v. American Honda Motor Co.* (1985), 153 Ariz. 389, 737 P.2d 365. Under these circumstances, where no single legal definition prevails, we must be content with the plain and common understanding of the term.

Webster's New Collegiate Dictionary 1128 (1981) defines "state of the art" as "the level of development (as of a device, procedure, process, technique or science) reached at any particular time usually as a result of modern methods." Webster's New World Dictionary 1391 (2d College ed. 1980) sets out "the current level of sophistication of a developing technology, as of computer science" as the meaning of "state of the art." Both definitions suggest the concept of technological advancement; neither contains an element of common practice.

If we construe the statutory defense then as requiring a showing that in developing its product, Wards employed standards of design conforming with the generally recognized state of technological or scientific knowledge existing at the time of manufacture,[5] we must conclude that a judgment on the evidence was not warranted. The record shows that the cable bead

---

4. Wards also argues that it was entitled to a judgment on the evidence because the absence of markings on the tire indicating maximum operating pressure and whether the tire required a tube did not render the tire unreasonably dangerous. Gregg maintains that he presented evidence with respect to the absence of these markings in support of his products liability warning theory, not as independent legal theories. A review of the pleadings and arguments confirm this. (R. 1:45; 10:2144; 17:4049). Accordingly, we find no basis for reversal here.

5. Were we to construe "state of the art" as the custom and practice in the industry, a manufacturer would be excused from liability, regardless of a product's defective, unreasonably dangerous condition, simply because other manufacturers were producing similar products. Industry custom and practice has never been a basis for avoiding liability in *negligent* design cases. *Dudley Sports Co. v. Schmitt* (1972), 151 Ind.App. 217, 279 N.E.2d 266, 276, *trans. denied.*

technology offered by Gregg as an alternative to the multi-strand weftless bead bundle design utilized by Wards was used in Pirelli bias-ply tires in 1974.

Inasmuch as we have determined that "state of the art" as employed in I.C. 33-1-1.5-4(b)(4) is not a legal term of art meaning industry custom or practice, the trial court did not err in rejecting Wards' tendered instruction 9 either.

### G. Proximate Cause

The element of proximate cause is determined in the same manner in a strict liability action as in an action sounding in negligence. *See, Jarrell v. Monsanto Co.* (1988), Ind.App., 528 N.E.2d 1158, 1167; *Shanks v. A.F.E. Indus., Inc.* (1980), Ind.App., 403 N.E.2d 849, 858. Proximate cause is established if the injury caused by the product is a natural and probable consequence which was, or should have been, reasonably foreseen or anticipated in light of the attendant circumstances. *Conder v. Hull Lift Truck, Inc.* (1982), Ind., 435 N.E.2d 10, 14. An intervening cause, such as product misuse and its attendant risks, will not operate to relieve a manufacturer of liability unless the intervening acts could not have been reasonably foreseen by the manufacturer. *Id.* at 17. The foreseeability of intervening misuse is usually a question for jury determination. *See, id.* at 15.

As other sections of this opinion indicate, Firestone knew about the problem of mismatch associated with the 16″ tire in 1974 when it manufactured the private brand Wards tire. Firestone tires manufactured at the same time had an appropriate warning. Patent literature produced by Firestone in 1955 demonstrates Firestone's knowledge of bead bundle breakage at low pressure due to chording and stress concentration at the splice caused by mismounting the wrong size tire to rim. Hence, there was evidence from which a jury could find the absence of warning of hazards associated with foreseeable product misuse and product design to be proximate causes of the injuries sustained by Gregg.

Wards compares this case with *Mobley v. Gen. Motors Corp.* (1986), La.App., 482 So.2d 1056, a 16″/16.5″ mismatch case in which a jury finding that the plaintiff's injuries were not caused by the lack of warnings was upheld, the appellate court reasoning that Mobley's injuries could not have been prevented by a warning because it was inconceivable that any warning could have told Mobley more than he already knew. As Gregg points out, the facts of *Mobley* are not ours. Mobley knew that a tire should be replaced with a tire of the same size, saw the 16.5″ marking on the old tire and 16″ on the new, removed a tubeless tire and replaced it with a tube-type, and knew that 40 psi was the maximum pressure advised by the manufacturer for sealing the tire yet continued to inflate the tire to twice the recommended pressure. In short, Mobley knew not to mismatch and not to overinflate and was aware of the dangers associated with his actions. On the other hand, the facts favorable to the verdict here demonstrate that Gregg knew nothing of the dangers of mismatch, was not given any notice by the tire's markings that a mismatch was occurring and did not overinflate the tire beyond that *anticipated* by the industry.

Gregg is aided in proving the absence of a warning was a proximate cause of his injuries by a presumption that an adequate warning would have been read and heeded. *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank* (1975), Ind.App., 332 N.E.2d 820, *reversed on procedural grounds*, 265 Ind. 457, 358 N.E.2d 974. In light of the contrary evidence adduced by Gregg, the jury could have properly determined that evidence of Barnes' failure to check the sizes of the tires and rims, the lack of evidence that Gregg or Barnes knew anything about the distinctions in mounting tubed and tubeless tires, Gregg's inability to determine the size by reading the manufacturer's markings and the fact that Gregg knew the maximum operating pressure of a passenger tire was insufficient to rebut the presumption that a warning would have been read and heeded.

Wards maintains that the presumption a warning would have been read and heeded must be considered in light of the fact that

Gregg was actually warned by Barnes of the risk of explosion due to overinflation yet proceeded to put more air in the tire despite the warning. Again, Wards premises its argument on a construction of the evidence least favorable to Gregg. Our reading of the record convinces us that the content of Barnes' admonition and Gregg's ability to hear the admonition were matters in dispute and logically susceptible of resolution in favor of Gregg.

Finally, Wards suggests that Budd's, a rim manufacturer, introduction of the defective 16.5″ rim long after Wards' design and manufacture of its 16″ tire constituted a superseding, intervening cause which cut off any liability Wards might have. While the introduction of the 16.5″ rim might at one time have been a superseding rather than concurrent cause, it is apparent from the record that Wards knew in 1974 when this tire was introduced into the stream of commerce of the misuse of its product in conjunction with a 16.5″ rim. "Generally, where harmful consequences are brought about by intervening and independent forces, the operation of which might have been reasonably foreseen, then the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent forces, and the original act will be treated as a proximate cause ..." 21 I.L.E. *Negligence* § 67, at 330–33 (1959) cited with approval in *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 159.

### H. Substantial Change

█ Wards contends that the absence of direct proof that the tire had not undergone substantial change after it left Wards' hands precludes Gregg's recovery. Substantial change has been defined as "any change which increases the likelihood of a malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put." *Craven v. Niagara Machine & Tool Works, Inc.* (1981), Ind.App., 425 N.E.2d 654, 655, *trans. denied,* quoting *Cornette v. Searjeant Metal Products,* 258 N.E.2d 652.

Wards cites no authority for its assertion that Gregg's prima facie case can only be made by direct proof of the facts in issue. To the contrary, essential facts may be established by circumstantial evidence. Direct evidence or eyewitness testimony is unnecessary. *Cerra v. McClanahan* (1967), 141 Ind.App. 469, 472, 229 N.E.2d 737; *Scutchfield v. Kull and Powers* (1965), 138 Ind.App. 49, 210 N.E.2d 260.

Although Gregg did not offer direct evidence that both bead bundles were intact prior to the explosion, Gregg's expert Dr. Milner testified that neither bead bundle could have been broken because Gregg and Barnes reported difficulty getting one of the beads to seat. An unbroken 16″ bead is too small for the 16.5″ rim. It will not move up against the flange and seat unless the bead wires which constrain it are broken.

Wards deduces from the testimony that because Gregg and Barnes got one of the beads to seat that one of the beads must have broken. This reasoning is contradicted by the testimony from experts Milner and Forney that one of the beads will move up into place on a 16.5″ rim.

There is no error in the denial of the motion for judgment on the evidence.

### II.

### *Evidentiary Errors*

### A. Hearsay

█ 1. Dr. Marvin Needler testified that he picked up exhibit one, a tire, from Scott's Service Station ten days after the explosion. He believed his belief based upon what he had been told by Scott and Barnes that exhibit one was the tire involved in the explosion. The trial court admitted exhibit one over Wards' hearsay objections as the tire Needler picked up on on August 3, 1979. Wards argues the trial court erroneously permitted Needler to identify exhibit one as the tire involved in the explosion.

While it is true that Needler was not at Scott's Service Station at the time of the explosion, exhibit one was not admitted as the tire which exploded until Gregg subse-

quently identified it. The harm, if any, stemming from Dr. Needler's identification of the tire based upon what others had told him was therefore necessarily remote and not reversible error.

■ 2. For the same reason, we find no reversible error in the trial court's admission over Wards' hearsay objections of George Scott's testimony concerning how he came to recognize the tire involved in the explosion. The jury could properly determine from Gregg's testimony that exhibit one was the tire which caused his injury. The introduction of otherwise inadmissible evidence which is merely cumulative is not prejudicial error. *Cornett v. State* (1983), Ind., 450 N.E.2d 498, 504.

■ 3. Wards also takes issue with the trial court's admission of expert Milner's testimony that exhibit one would have been in service as a tubeless tire because the wheel associated with it, exhibit two, which the owner identified as the rim he left at the station, had a tubeless valve in it. Wards moved to strike this testimony on the basis that Milner had no personal knowledge of the subject and was therefore being permitted to speculate.

Again, we cannot discern the harm occasioned by the admission of this testimony. Wards' argument seems to be that the testimony tended to prove that exhibit one was the tire involved in the explosion. If that were the case, any damage would be minimal in light of other similar evidence of record.

B. Testimony of Expert Forney

■ 1. Wards challenges the adequacy of the foundation supplied by Gregg for admission of test results establishing the range of psi at which the bead bundle of a 16″ tire will break when mismatched with a 16½″ rim.

■ An offer of test results raises a question of relevancy. Evidence of testing may be admitted if the conditions under which the tests were conducted are substantially similar to those existing in the transaction being investigated. *Chrysler Corp. v. Alumbaugh* (1976), 168 Ind.App. 363, 342 N.E.2d 908, 919, *trans. denied*

citing *Vandalia Ry. Co. v. Duling* (1915), 60 Ind.App. 332, 348, 109 N.E. 70, 75. The extent of similarity necessary varies with the fact the test is seeking to prove. *Alumbaugh*, 342 N.E.2d at 919, n. 8. Hence, as with other questions of relevancy, the trial court must exercise discretion. *Id.*

Expert Forney tested 16″ tires mismatched with 16.5″ rims to determine the lowest amount of psi which would cause the bead bundle of the tire to break. Forney performed well over 200 tests on both new and used 16″ tires from a variety of manufacturers, including Firestone, all having solid beads on both sides of the tire. Forney used both dry and wet mountings. He used various lubricants. He performed his tests on tires with different load ranges, starting at load range D, and with varying numbers of bead wires. He monitored the placement of the splice in the rim by x-ray. The dimension of the bead wires in the bundle at that time were all the same.

According to Forney, the lowest pressure break derived from the tests occurred at 52 psi while the maximum pressure at which a break would occur was 135 psi. Some bead bundles did not break at all. Generally, the breaks fell into a bell-shaped distribution, most breaks occurring within the range of 60–80 psi.

The used truck tire which injured Gregg required 60 psi to operate the tire correctly. It had a load range of "D". The tire had a bead with a 5 degree taper on both sides and a continuous belt with five wraps which rendered its splice comparatively short. Gregg and Barnes mounted the tire with lubricant on a 16.5 Budd rim. The tire had approximately 40–50 psi in it shortly before the explosion.

Presumably, Gregg intended the jury to draw from the results of Forney's testing the inference that bead breaks routinely occur in mismatched 16″ tires at less than or equal to the air pressure expected to be in the tire when put to normal use. We are not told by Forney exactly where in the range of all 16″ tires tested those manufactured by Firestone with short splices, a

load range designation of D, and a wet mounting tended to fall, and there is no *direct* evidence that both bead bundles of this particular tire were intact. Even so, Forney's results do have some tendency to prove that bead breaks can and do occur because of a mismatch without any overinflation of the tire by the mounter. Therefore, we cannot say the trial court abused its discretion in permitting the jury to consider this evidence. The weaknesses of these results could be exposed by Wards on cross-examination.

2. Wards also questions the admission of Forney's opinion that the tire was defective and unreasonably dangerous on the basis that Forney was not shown to have any greater expertise on the ultimate fact in issue than the jurors or shown to have experience in evaluating tires for their dangerous propensities. This argument strains the imagination. Though undoubtedly most jurors have handled tires, the science of tire engineering and design is not a matter of common knowledge. An expert may be permitted to give an opinion when the subject of the opinion is a matter unrelated to the experience and knowledge of the average juror, provided the opinion is preceded by a foundation of evidence establishing the witness' credentials as an expert and he reliability of any scientific methods utilized by the witness to reach an opinion. *Noblesville Casting Div. of TRW, Inc. v. Prince* (1982), Ind., 438 N.E.2d 722, 727, (Pivarnik, J. and Givan, C.J., concurring in result, DeBruler, J., not participating).

The record shows that Forney holds a bachelor of science degree in mechanical and industrial engineering. He spent six years working for Firestone as a tire engineer, overseeing the design and manufacture of tires and monitoring wear in the field. Thereafter, over the next eleven years, in a variety of positions with private industry, technical associations and consulting firms, Forney determined whether particular rims met specifications; directed over 400 nationwide tests on rayon chording; analyzed tire and rim failure; supervised a high-speed, heavy-duty truck tire program for the General Services Administration; studied the advantages and disadvantages of the tubeless tire; schooled industry personnel on the proper use, maintenance and repair of tires; and performed private testing for industry and compliance testing for the U.S. government. In 1971, Forney formed his own consulting firm and performed the tests on 16″ tires discussed earlier. Forney told the jury that he had lots of hands-on experience mounting and dismounting tires and knew about as much as anyone on the manipulation of truck tires and rims.

Gregg has shown Forney to be aptly qualified. Without doubt, Forney's testimony would have assisted the jury in understanding the tire's dangerous propensities. We note in addition that Forney's opinion on these factual issues is not excludable on the basis that it invades the province of the trier of fact. *DeVaney v. State* (1972), 259 Ind. 483, 288 N.E.2d 732, 737.

Wards also maintains that Forney lacked the qualifications to opine that the tire was defective because it did not in some way warn the user of the dangers associated with mismatching tire and rim. In *Ortho Pharmaceutical Corp. v. Chapman* (1979), 180 Ind.App. 33, 388 N.E.2d 541, *trans. denied,* we confronted a similar contention. There we reiterated that the courts have never undertaken to set up a standard of scientific knowledge by which the competency of a witness is to be tested. We held that an expert qualified in the subject matter generally need have no special training or expertise in reading and writing warnings.

Lastly, Wards contests the trial court's decision to permit Forney's testimony elicited on redirect examination, that warnings prevent accidents, to remain in the record. That warnings prevent accidents is the basic premise of Gregg's action and a matter of common knowledge for which Forney needed no special expertise.

C. Testimony of Dr. Milner

Wards contends that Dr. Milner's assessment of the amount of pressure

in the tire at the time of the explosion should have been excluded because Milner relied in part upon the report of Dr. Needler, who was the first expert to examine the tire, that the bead wires were not sticking through the elastium until after Needler's pressure tests on the tire. Needler's description of the condition of the bead wires is a matter of record. An expert may testify on the basis of first-hand knowledge or facts in the record. *Estate of Hunt v. Bd. of Comm'rs of Henry County* (1988), Ind.App., 526 N.E.2d 1230, 1232, *trans. denied; Senco Prod., Inc. v. Riley* (1982), Ind.App., 434 N.E.2d 561, 565.

■ Milner also testified that in his opinion the bead design rendered the tire defective and unreasonably dangerous. Wards again argues that this testimony was improper and should have been excluded because Milner is a metallurgist, not a tire or safety expert.

Dr. Milner's description of himself as a professional engineer, metallurgist, and failure analyst with a background in physics and chemistry as well as metallurgy briefly summarizes the thirteen pages of record containing his credentials and experience. Dr. Milner considers bead failure explosions to be one of his specialties, having investigated 150–200 actual failures, conducted experiments collateral to that involving the investigation of the structure, developmental history and technology of all types of beads, and extensively studied the patent literature. Certainly, Dr. Milner has knowledge and experience relevant to Gregg's theory that the design of the bead bundle was defective and unreasonably dangerous. The trial court properly permitted Dr. Milner to offer his opinion. Cross-examination is the appropriate means of testing the extent of his knowledge and experience. *Martin v. Roberts* (1984), Ind., 464 N.E.2d 896, 901.

### D. Testimony of Expert Edwards

Our determination earlier that an expert witness need not be specially trained to express the opinion that a product is defective and unreasonably dangerous because it lacks an adequate warning applies with equal force to Wards' contention that Edwards was not competent to so opine.

Wards complains that it was prejudiced by the injection of Firestone's liability for the rim design into the case and the trial court's refusal to cure that prejudice by instructing the jury that Wards had no liability for the design or manufacture of the Budd rim. The purportedly prejudicial testimony was elicited by Wards on cross-examination when Wards asked Edwards whether he believed the Budd rim to be defective. Edwards opined that the rim was defective because it permitted a 16″ tire to be mounted on it, then qualified his response by explaining that his opinion applied to both the Firestone design and the Budd-made rim. Rather than moving to strike the qualification as unresponsive, counsel argued with Edwards that he (Edwards) had no information the rim had been designed by Firestone and then moved to strike on the ground that "no Firestone rim was involved in the case."

■ Having failed to move to strike on the ground that the answer was nonresponsive, Wards cannot now complain of the introduction of unfavorable evidence on a topic it raised, even if it was prejudiced. *Cf. Johnson v. Wilson* (1937), 211 Ind. 51, 5 N.E.2d 533. Furthermore, the motion to strike does not clearly indicate the evidence to have been improperly admitted. *Public Serv. Co. of Ind., Inc. v. Levenstein Bros.* (1965), 246 Ind. 520, 528, 207 N.E.2d 202. We perceive no reversible error here.

### E. Evidence of other claims

■ The trial court precluded Wards from asking Gregg whether he had made claims against other defendants and granted Gregg's motion to strike the question and answer of witness Asher whether he had once been a defendant in the case. Wards argues that the precluded testimony was admissible as an admission against interest.

In *Ind. State Highway Comm'n v. Vanderbur* (1982), Ind.App., 432 N.E.2d 418, the plaintiff restructured her wrongful death lawsuit alleging concurrent negligence of the State and defendant Redmon

by severing the action against Redmon, making him a plaintiff, and proceeding initially only against the State. The trial court then granted the plaintiffs' motion in limine prohibiting the State from placing before the jury the existence of the suit against Redmon. The State took the position that Redmon's negligence was the sole proximate cause of the decedent's death and Vanderbur's allegation of negligence on Redmon's part was admissible as proof of that position. There, as here, the trial court excluded the complaint but permitted the State to prove the underlying facts touching upon the proximate cause issue. We upheld the trial court's use of discretion because the denial of allegations made in the complaint places those facts at issue. 432 N.E.2d at 422.

In the present case, Wards did not seek to introduce the allegations of the complaint, but attempted to elicit testimony from the various witnesses that they had once been named a defendant or had named others as defendants. The allegations of negligence made by Gregg had been denied. Hence, the fact that Gregg once alleged that conduct of others concurrently caused his injuries is not evidence but a fact in issue. We conclude the trial court did not abuse its discretion by disallowing this testimony.

### F. Testimony pertaining to Medical Expenses

On direct examination, Gregg attempted to testify that he had incurred a total of $86,176.62 in medical expenses. Gregg brought to the witness stand a compilation of his expenses including copies of his medical bills. Wards objected to testimony of the total sum expended on the ground that Gregg himself did not have personal knowledge of the charges but was testifying from hearsay since the bills had not been properly authenticated.

A witness may be permitted to refresh his memory of facts, by referring to a written memorandum, written either by himself or by another, at or near the time of the occurrences; but the memorandum cannot be substituted in the stead of the recollection of the witness. If an inspection of the writing recalls to the mind of the witness facts which he had previously known, but which had, at the moment, escaped his recollection, he can then testify to such facts as being within his own personal knowledge.

Clark v. State (1853), 4 Ind. 156, 157 cited with approval in Buck v. State (1983), Ind., 453 N.E.2d 993, 1000. Cf. Parker v. State (1981), Ind.App., 424 N.E.2d 132, 135, trans. denied. (Witness refreshed memory from notes before taking witness stand.) A document used solely for the purpose of refreshing the witness' recollection need not be authenticated. Id. However, the witness must possess independent knowledge of the facts contained in the memorandum before it can be used to refresh the witness' recollection. Southern Ry. Co. v. State (1905), 165 Ind. 613, 75 N.E. 272; Carter v. State (1980), Ind.App., 412 N.E.2d 825, 828, trans. denied.

Gregg demonstrated independent knowledge of particular charges and the reasons for costs associated with changes in his treatment. He testified that he ultimately received the bills and they had been paid. Consequently, we find no reversible error in permitting Gregg to refer to the compilation of expenses to obtain the total cost of his medical care.

In any event, the evidence complained of could only affect the amount of recovery. When considered in view of the evidence showing the injuries sustained, together with the amount of the verdict, we cannot say that the substantial rights of Wards were prejudiced. Cf. Walter v. Pence (1938), 104 Ind.App. 532, 12 N.E.2d 367.

### III.

#### Instructions

Wards posed multiple objections to many of the instructions given by the court. We have limited our review to the objections stated at trial. Carrier Agency, Inc. v. Top Quality Building Prod., Inc. (1988), Ind.App., 519 N.E.2d 739, 744, trans. denied. An objection that instructions are confusing and misleading, or that the instruction is not a correct statement of the

law is not a specific objection. *Id.;* Ind.Trial Rule 51(C). Objections made but not argued or adequately developed are also deemed waived. Ind.Appellate Rule 8.3(A)(7).

#### A. Instructions Given

##### 1. Instruction 12

■ Wards objected to the charge that the rule (I.C. 33–1–1.5–3(a), (b), quoted verbatim in the preceding instruction) applies even though the manufacturer is free from negligence and has exercised all possible care in the preparation and sale of its product. Wards maintains that this language improperly interjects an element of negligence into the case and is an incorrect statement of the law because similar language is absent from the 1978 and 1983 statutes.

We have in fact held that despite a finding that a manufacturer has not been negligent as a matter of law, a plaintiff can still recover based upon I.C. 33–1–1.5–3 (1978). *Borden, Inc. v. Cyphers* (1985), Ind.App., 486 N.E.2d 635, 637, *trans. denied.* Amended I.C. 33–1–1.5–3(b)(1) which permits liability to be imposed even if "the seller has exercised all reasonable care ..." reflects this premise. Furthermore, the instruction on its face purports to remove negligence considerations from the purview of the jury, not inject them. Instruction 12 correctly sets forth the law.

■ Wards argues that the statement "a product may be defective and unreasonably dangerous because of deficiencies or inadequacies in warnings" is an erroneous statement of the law because it fails to communicate that the absence of warning must make the product *both* a defective product and unreasonably dangerous. Wards cites no authority for this assertion and has not cogently set out for us what needs to be proved for each component. As the second district noted in *Jarrell,* 528 N.E.2d 1158, 1166, a case applying the 1983 Act, there are two lines of reasoning concerning the legal effect of warnings, one viewing the absence as a defect in the product itself, perhaps stemming from § 402A, comment h, and the other treating the phrase "defective condition" as lacking independent meaning, the absence of warning rendering a dangerous product *unreasonably* dangerous. *See e.g. Ortho,* 388 N.E.2d 541. This view also finds support in § 402A, comment j. We need not resolve the controversy here. The trial court instructed the jury that Gregg's burden was to prove that Wards sold the tire "in a defective condition unreasonably dangerous to the user." Instruction 12 permits the jury to reach that conclusion by either route. It is not an incorrect recital of the law.

■ The last paragraph provides "[a] product may be defective because of a failure to supply adequate warnings with respect to potential dangers in the use of the product, though the product is virtually faultless in design, material and workmanship if reasonable prudence would require such a warning." This language appears to have its origin in *Nissen Trampoline Co.,* 332 N.E.2d 820 and was held to correctly state the law in *Senco Prod., Inc.,* 434 N.E.2d 561. § 402A requires a finding of negligence in endeavoring to warn of a risk in addition to a conclusion as a matter of law that the product is in a "defective condition unreasonably dangerous." *Ortho,* 388 N.E.2d at 551.

Wards' disagreement with the language "potential dangers" is not clear. We agree, not all potential dangers subject a manufacturer to strict liability. The instruction does not suggest otherwise.

##### 2. Instruction 14

■ Instruction 14 is a verbatim recitation of I.C. 33–1–1.5–2.5 (1983) with the exception that it refers to "[a] defective product" "in a defective condition" and substitutes "damage" for "danger" in the phrase "warnings of danger" which appears in I.C. 33–1–1.5–2.5(b)(1). Wards objects to these minor deviations; however, they do not amount to reversible error absent a showing that the instruction was in fact misleading. *Grad v. Cross* (1979), 182 Ind.App. 611, 395 N.E.2d 870, 873. The instruction is also not challengeable as an incorrect statement of the law simply be-

cause the language parrots a statute which had not been enacted until 1983. Wards must show how the instruction incorrectly stated the law in 1980. *Kroger Co. Sav–On Store v. Presnell* (1987), Ind.App., 515 N.E.2d 538, 544, *trans. denied.* The concept that a product may be defective because of a manufacturer's failure to "[g]ive reasonably complete instructions on proper use of the product" is not an innovation in Indiana products liability law. The idea that a manufacturer may need to give directions as to use in order to prevent a product from being unreasonably dangerous appears in the first sentence of § 402A, comment j. The adequacy of warnings is governed by negligence principles. *Ortho*, 388 N.E.2d 541; *Jarrell*, 528 N.E.2d at 1166.

Wards argues that the "reasonable diligence" language inappropriately interjects negligence concepts, but does not elaborate as to why negligence principles are inappropriate. As we have indicated, products liability suits premised upon a warning theory involve concepts typical of negligence theories. *Cf.* § 402A, comment j, and see *Ortho*, 388 N.E.2d 541.

Wards cites no authority for the assertion that the instruction inadequately conveys the law because it does not tell the jury what the warnings or instructions had to be. If the instruction was incorrect because it failed to spell out the warning required, Wards should have tendered an instruction to that effect or specified exactly what had been omitted. *Anderson v. Taylor* (1972), 154 Ind.App. 217, 289 N.E.2d 781, 785.

### 3. Instruction 8

■ Wards' objections to instruction 8 which charged a corporation with the knowledge it would have acquired upon reasonable inquiry are first, that it again confuses the jury as to the appropriate standard and second, that it instructs the jury on propositions of the law not pertinent to the issues or applicable to the evidence. Again, Wards has not enlightened us as to the appropriate standard or developed fully the issue it is raising. We there-

fore believe it sufficient to observe that, although there may be some disagreement regarding the path Indiana law has taken since 1983, *see, Jarrell*, 528 N.E.2d 1158, Shields, J., dissenting, prior to the 1983 amendment, knowledge of a product's defective condition was not absolutely imputed to the manufacturer. At least with respect to a manufacturer's obligation to warn, a showing of actual or constructive knowledge of the danger was required. *Craven*, 417 N.E.2d 1165, 1167; *Ortho*, 388 N.E.2d at 548. However, Indiana law also attributed a manufacturer with the knowledge of an expert in the field. *Id.* at 553. This approach is consistent with § 402A, comment j which would require a manufacturer to warn if "by application of reasonable, developed human skill and foresight [it] should have knowledge ..." Instruction 8 does not impose a stricter standard than this. It goes without saying that the instruction was relevant to Gregg's warning theory.

### 4. Instruction 21

■ The first two sentences of instruction 21 read:

A manufacturer has a duty to warn buyers or users of defects of its' (sic) product. This duty to warn applies even if the product is perfectly inspected, designed, and manufactured.

Wards argues that this portion of the instruction was unduly confusing because it is a patent contradiction in terms to refer to a "perfect product" as "defective." Admittedly, this paragraph would have been clearer had the instruction used "dangers" instead of "defects." However, we find it unlikely that the jury would have been misled by this nuance. The remainder of the instruction makes clear that the duty to warn applies to dangers involved in the use of the product. Instructions are to be considered as a whole. *Carrier Agency*, 519 N.E.2d at 744.

The same reasoning applies to Wards' complaint that the instruction fails to elucidate that warnings are required only if the failure to warn would render the product defective and unreasonably dangerous.

This idea was supplied by the following instruction, number 6.

Lastly, Wards raises anew its argument, addressed in the proximate cause section, that its evidence rebutted the presumption a warning would have been read and heeded, and hence the evidence did not warrant an instruction on the presumption. As we indicated *infra*, the evidence created a jury question. Necessarily the jury would need to know of the presumption to properly evaluate the facts. Wards' argument that presumptions of law have no proper place in instructions was not the basis of its objection at trial.

### 5. Instruction 22

■ Wards contends it has no duty to provide warnings "in a form that will reach the ultimate user" and to so instruct the jury would be misleading. Wards did have a duty to adequately warn. Under the facts of this case, the jury might determine that the warning Wards placed on a sticker it attached to the tread was inadequate because it would wear off long before the tire became useless. Moreover, this is not a case where the manufacturer's warnings and instructions are filtered to the ultimate user through a "learned intermediary." The warning in question would necessarily be effective only if it was designed to reach the ultimate user. *Cf. Ortho*, 388 N.E.2d 541. The instruction stated Gregg's theory of the case and was not misleading.

Wards' second objection once again is to the court's use of "defects" in the broader sense employed by § 402A, i.e. meaning the risk of harm or danger inherent in the use of the product. Again, the court's use of the term is consistent with Indiana law; semantic nuances are unlikely to have had an impact on the jury's verdict. *Grad*, 395 N.E.2d at 873. *See also Mullins v. Bunch* (1981), Ind., 425 N.E.2d 164; *Hendrix v. Harbelis* (1967), 248 Ind. 619, 624, 230 N.E.2d 315.

### 6. Instruction 23

■ This instruction stated simply that Gregg's failure to discover the alleged defects in the tire in question or to guard against the possibility of their existence is not a defense to strict liability. Wards' objection is that it never raised Gregg's contributory negligence as a defense, and hence, the trial court erred in instructing on propositions of law not applicable to the issues or evidence.

Though Wards may not have formally raised Gregg's negligence as a defense, it did take the position that it had no duty to warn Gregg because Gregg knew or should have known of the danger, suggesting that an evaluation of Gregg's conduct was appropriate not just to determine whether he appreciated the danger and knowingly accepted the risk but also whether he acted reasonably under the circumstances. The trial court's final instruction 4 properly restricted the jury's consideration of the obviousness of the danger to the determination of whether the tire was "in a defective condition unreasonably dangerous." *See, Koske*, 551 N.E.2d 437. Wards' argument suggests that proper evaluation of the evidence involved something more than that. The instruction is therefore not assailable on the ground it was inapplicable to the issues or evidence.

### 7. Instruction 29

■ Wards also contends that the trial court erred in instructing the jury that it could assess damages on the basis of impaired earning capacity as there is no evidence in the record to warrant such an instruction.[6]

■ The gist of the element of impaired earning capacity is a showing of adverse effect on the plaintiff's vocation. As one federal court put it, under Indiana law, one is entitled to recover for damages resulting from an injury which causes a career change or, in effect, "closes the door" to a preferred or desired field of employment.

---

**6.** Wards also challenges the instruction on grounds that Gregg offered no evidence of reasonable expenses of necessary medical care and no evidence of future medical expenses. We have already addressed the first part of Gregg's argument in section II. F. *infra*. No objection based upon the absence of evidence of future medical expenses was voiced at trial.

*Grubbs v. U.S.* (N.D.Ind., 1984), 581 F.Supp. 536, 541. The basic measure of damages for impairment of lost earning capacity is the difference between the amount which the plaintiff was capable of earning before the injury and the amount which he is capable of earning thereafter. *Scott v. Nabours* (1973), 156 Ind.App. 317, 296 N.E.2d 438.

We find evidence in the record from which the jury could find and assess an adverse effect upon Gregg's earning capacity. At the time of the explosion, Gregg worked as a correctional officer at the Indiana Youth Center. He returned to work there approximately June 7, 1980 but was off work for extensive periods of time, the last absence occurring from December 31, 1986 through February 11, 1987. At that time, he made $7.69 per hour. Gregg's former supervisor testified that Gregg's overall attitude is very good but since his return, they had had to make the assignments easier for him. Gregg has twice been overlooked for a promotion which would amount to a 9% increase in base salary because of absenteeism and physical ability to do the job.

### B. Tendered Instructions

#### 1. Instructions 7, 14, 15, 16

Wards contends the trial court committed reversible error by deleting the mandatory language "must" and "shall" in Wards' tendered instructions 7, 14, 15 and 16, each stating the law of an affirmative defense, and substituting "may" instead. Wards contends the permissive language suggested to the jury that it could find for the plaintiff even though Wards' affirmative defenses had been proved.

Indiana courts have repeatedly cautioned trial judges about the dangers of giving instructions which are mandatory in form. A trial judge may refuse a tendered instruction when it can be framed to cover the principle of law without mandatory language. *White v. Evansville Am. Legion Home Ass'n* (1965), 247 Ind. 69, 210 N.E.2d 845, 848.

Wards also argues the trial court erred in deleting the phrase "either by mounting the tire on the wrong sized wheel or by over-inflating the tire" from Wards' tendered instruction 16. This objection was not raised at trial; consequently, it is waived on appeal.

#### 2. Instructions 3 & 5

Wards' tendered instructions 3 and 5, in critical part, informed the jury in language similar to that found in § 402A, comment i, that a product is in a defective condition unreasonably dangerous only when it has "a propensity or tendency for causing harm beyond that which would be contemplated by the ordinary user having ordinary knowledge of the product's characteristics common to the foreseeable class of persons who would normally use the product."[7] Wards argues that it was error to refuse this instruction because the definition of · "unreasonably dangerous" was not contained in any other instruction.

Final Instruction 15 charged the jury that in order for Gregg to recover on his complaint he must establish "that at the time the tire was sold, it was in a defective condition unreasonably dangerous to the user or consumer, ..." The issue as we see it is not whether the court defined the terms "defective condition" and "unreasonably dangerous" but whether the instructions as a whole conveyed the central notions that there must be a risk of harm inherent in the product and that that risk is one which is beyond that expected by ordinary users of the product.[8]

Although the trial court here did not define "unreasonably dangerous," it did give the jury the objective test for assess-

---

7. Wards' proposed instruction 5 goes beyond § 402A, comment i in that it attempts to define "dangerous" and "community." We cannot find fault with either substitution. I.C. 33–1–1.5–3(a) (1978) diverged from § 402A by adding the limitation that the user be "in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition." In this respect, the Indiana act has notably departed from the broader reach of strict liability followed elsewhere. *Cf. Sills v. Massey–Ferguson, Inc.* (N.D.Ind., 1969), 296 F.Supp. 776, 781 (decided under rubric of § 402A).

8. A careful reading of § 402A, comments g through k leads us to conclude that "defective condition" refers not so much to a flaw in the product but to some aspect of the product which

ing a product's dangerous propensities using the language of the 1983 Act, I.C. 33–1–1.5–2.5. An instruction in the language of § 402A, comment i would not have added anything of substance; therefore, it was not reversible error to reject Wards' instruction 5.[9]

We are not swayed in this conclusion by the supreme court's decision in *Bemis Co., Inc. v. Rubush,* 427 N.E.2d 1058. There, not only was the appropriate standard not before the jury but the plaintiff's expert had expounded his own theory of an unreasonable risk. Though other jurisdictions have adopted a standard like that proposed by the expert in *Bemis, see e.g. Sturm, Ruger & Co., Inc. v. Day* (1979), Alaska, 594 P.2d 38, and the Restatement utilizes a similar approach in negligence cases, *see* Restatement (Second) of Torts § 291 (1965), Indiana has not moved toward the use of a utility/risk formula to assess unreasonableness in strict product liability cases. *But cf. e.g., Harper v. Guarantee Auto Stores* (1989), Ind.App., 533 N.E.2d 1258, 1265; *Phillips v. Croy* (1977), 173 Ind.App. 401, 363 N.E.2d 1283, 1285, *trans. denied.* In any event, the risk that the jury would employ an erroneous standard is not present in this case. We conclude that the critical substance of tendered instructions 3 and 5 was adequately covered by other instructions.

3. Instruction 12

■ Wards contends it was entitled to an instruction directing the jury to find against the plaintiff on its warning theory if it found either that the plaintiff did not read anything written on the tire or would not have understood a warning on the tire.

We are not aware of any basis in the record for concluding that Gregg was either illiterate or possessed a disability which would have prevented him from understanding a simple warning. Gregg had obtained the equivalent of a high school diploma. Wards' theory that Gregg could not understand is simply not supported by the evidence. Nonetheless, even if the instruction did not include Gregg's inability to understand, it still would be inappropriate because it would have precluded the jury from drawing the reasonable inference, supported by the record, that Gregg would have seen and read a prominently placed warning similar to those exhibited on other tires because he was working directly over the tire at the time of the explosion. There was no error in refusing this instruction.

4. Instruction 17

The trial court gave an instruction on the defense of incurred risk in the language of the statute, which, if different from the common law doctrine, displaced it. The doctrine of incurred risk was therefore adequately covered.

Judgment affirmed.

BAKER and STATON, JJ., concur.

---

makes the product unsafe for its intended use. When "defective condition" is construed in this manner, however, § 402A's "defective condition unreasonably dangerous" formulation contains somewhat of a redundancy in terms. Our courts have either expressly recognized this logical inconsistency, as in the warnings context, *cf. Jarrell,* 528 N.E.2d 1158 and *Ortho,* 388 N.E.2d at 544, or have done so effectively, as in *Gilbert v. Stone City Constr. Co., Inc.* (1976), 171 Ind.App. 418, 357 N.E.2d 738, 743–745, by applying the "unreasonably dangerous" test to determine whether a product has been defectively designed. Other jurisdictions have simply done away with the "unreasonably dangerous" component in all cases but those involving unavoidably unsafe products. *See e.g. Azzarello v. Black Bros. Co., Inc.* (1978), 480 Pa. 547, 391 A.2d 1020 and *Wiska v. St. Stanislaus Social Club, Inc.* (1978), 7 Mass.App.Ct. 813, 390 N.E.2d 1133.

9. Instruction 3 contains extraneous statements of the law to which we do not subscribe. For one, it tells the jury that the plaintiff must prove both a defective condition and that the defective condition rendered the tire unreasonably dangerous. As we have indicated, such a statement may be misleading in warning and design cases. The plaintiff's burden of proof is properly stated in final instruction 15. Instruction 3 also imposes a constructive knowledge requirement on the expected user. We know of no authority or reason for applying such a standard. A trial court has no duty to redact erroneous statements of the law from a tendered instruction. *Mullins,* 425 N.E.2d at 166.